This timely appeal arises from a juvenile court decision granting permanent custody of Sarah Maloney, born June 16, 1989, Elizabeth Maloney, born November 7, 1987, and Fayette Maloney, born September 19, 1985 to Appellee Columbiana County Department of Human Services (hereinafter "CCDHS") and terminating the parental rights of Appellants Phyllis Mitchell (hereinafter "Mitchell") and William Maloney (hereinafter "Maloney"). For the following reasons, this Court affirms the lower court decision.
The lengthy history of this case is presented as follows: Appellants married in 1981 and three children were born of the marriage. (Maloney's Br. p. 8). The parties separated in 1991. (Maloney's Br. p. 8). On August 9, 1993, the juvenile court granted CCDHS' oral request for emergency temporary custody of the children. On August 10, 1993, CCDHS filed a written complaint requesting emergency temporary custody of the children who were residing with Mitchell. Maloney was residing in Missouri at. this time. The complaint alleged that the children were dependent. A CCDHS investigative report indicated that CCDHS had prior involvement with the family and on July 19, 1993, allegations of physical and sexual abuse of the children were substantiated. The perpetrator was identified as Mitchell's live-in boyfriend. The agency at that time gave Mitchell a place to stay for three days and meal allotment while she attempted to find housing. On July 26, 1993, CCDHS placed the girls in emergency day care and found that the girls had head lice that was so bad and that they had contacted so often that they had developed an immunity to treatment. As of August 9, 1993, Mitchell had not found a home and had lost her Aid to Dependent Children benefits due to the lack of a permanent address. The CCDHS investigator also found that Mitchell maintained contact with the perpetrator of sexual abuse.
On August 13, 1993, Mitchell stipulated to a finding of dependency for the children at the probable cause hearing and the court continued temporary custody of the children in CCDHS. The court appointed counsel for Mitchell and appointed a guardian ad litem to represent the children's interests. At the adjudicatory hearing held on September 2, 1993, the parties stipulated that the children were dependent, that from approximately August 9, 1993 until the date of hearing Mitchell had no residence, that the children suffered from long term head lice and that Mitchell had no income to support the children. The court found the children dependent and continued temporary custody in CCDHS.
On October 27, 1993, CCDHS filed a case plan for Mitchell detailing objectives that she must meet in order to be reunified with her children. CCDHS projected that Mitchell would complete the goals and reunification would occur by April 27, 1994. These goals included the following: She would secure and maintain safe and stable housing; protect her children from physical and sexual abuse by not associating with anyone who would place her children at risk; attend parenting classes; obtain a psychological evaluation and attend any recommended counseling; and maintain adequate home conditions by keeping her home clean and free of clutter.
Upon Maloney's return to Ohio the court appointed him counsel in this matter. Shortly after Mitchell's case plan was set up, CCDHS established a case plan for Maloney, as he had expressed an interest in being a resource for the children. Maloney's case plan goals included obtaining employment; securing and maintaining safe, stable and independent housing for the children; demonstrating an ability to parent by attending parenting classes; obtaining a psychological evaluation and any recommended counseling; and demonstrating adequate housekeeping standards.
On November 3, 1993, the court held the final dispositional hearing where all parties agreed to the case plan and its addition of Maloney. The court continued temporary custody of the children in CCDHS. CCDHS investigated the possibility of placement with a relative. The new CCDHS investigator on the case provided written updates to the court on the children and on the parents' progression with the case plan objectives, which were not substantial. Mitchell had yet to find suitable housing for the children and had been terminated from general assistance benefits for lack of cooperation. She had accomplished no case plan goals except for visitation with her children. Maloney had not obtained employment and had not obtained independent housing. He maintained residence with Mitchell's mother and sister, his ex-mother- and sister-in-law. He did visit the children.
On February 23, 1994, the court reviewed the case and approved CCDHS' amended case plan extending the goal completion and reunification date to October 27, 1994. The court continued temporary custody of the children in CCDHS and stated that it anticipated reunification. On March 4, 1994, Mitchell and Maloney divorced. (Maloney's Br. p. 8). On August 9, 1994, CCDHS conducted a semiannual administrative review of the case and put relative placement on hold as the relatives under consideration expressed concerns about handling the children.
On July 18, 1994, the CCDHS investigator filed an updated report indicating that Mitchell still lived in unsuitable one room housing but had obtained part-time employment on June 3, 1994. However, when the investigator called the employer on June 30, 1994, the investigator was told that Mitchell no longer worked there. She also failed to keep in touch with the caseworker. Mitchell did attend counseling and parenting classes and obtained a psychological evaluation, however she was still associating with the perpetrator of the children's sexual abuse and denied to the caseworker that her children had been sexually abused.
The investigator found that Maloney was still living with his ex-mother-in-law and ex-sister-in-law and had not found independent housing nor shown that he could live independent of his ex-relatives. Maloney did obtain full-time employment and obtained a psychological evaluation. Both parties continued to visit the children but Mitchell acted inappropriately with the girls and Maloney had little interaction at the visits. The placement with relatives was still proceeding, but with caution.
On July 25, 1994, the court held another review hearing and approved CCDHS' amendment to the case plan, again extending the completion dates to April 27, 1995. The court continued temporary custody of the girls in CCDHS. On October 5, 1994, CCDHS received a letter from their prospective relative placement indicating that they no longer wished to be considered as a placement. On October 19, 1994, the assistant prosecuting attorney filed a motion on behalf of CCDHS to extend temporary custody, requesting the extension so that Mitchell and Maloney could have additional time to comply with their case plan objectives.
On November 23, 1994, the CCDHS worker on the case provided an updated report to the court. The report indicated that the worker had conducted an announced home visit to Maloney's home and found that he was still residing with his ex-mother-in-law and ex-sister-in-law. The worker reported that the home was cluttered and without running water or heat. The ex-sister-inlaw told the worker that Maloney and his ex-mother-in-law had moved into another home together. The worker also conducted an announced home visit to Mitchell's trailer home and reported that the trailer had no heat except for a small electric heater located in the living room area. The trailer had only one small bedroom. The worker indicated that the trailer was cluttered and building materials were scattered all over the front porch. Mitchell admitted to the worker that she was still seeing the perpetrator of sexual abuse and that he visited her at the trailer. The worker recommended that CCDHS prepare to move for permanent custody of the children.
On November 29, 1994, the court held another review hearing. CCDHS filed a case plan amendment to move the children from their foster home to a second foster home due to alleged abuse of the children in the foster home. The court adopted the amendment and continued temporary custody of the girls in CCDHS.
On February 15, 1995, a report from Sanctuary Advocacy for Violence Elimination (hereinafter SAVE) was filed with the court indicating that Mitchell had completed parenting sessions and had been attending a domestic violence support group for victims. She also completed a psychological evaluation.
On March 15, 1995, Maloney filed a motion to have an attorney as guardian ad litem represent the children, as the current guardian ad litem was not an attorney.
On March 16, 1995, the assistant prosecuting attorney on behalf of CCDHS filed a motion for permanent custody of the girls stating that neither parent had made significant progress toward their case plan objectives and that it was in the best interests of the children that CCDHS be granted permanent custody. On March 20, 1995, Maloney filed a motion requesting "permanent custody" of the girls.
On May 15, 1995, the court held a pretrial and set the motion for permanent custody for trial and overruled Maloney's motion to replace the current guardian ad litem with an attorney. The court also ordered the guardian ad litem to submit a written report with recommendations as to permanent custody and took Maloney's request for an in-camera review with the children under advisement. The court continued temporary custody of the children in CCDHS. On May 18, 1995, the court received a letter and report regarding Maloney's completion of parenting classes with SAVE.
Trial on the merits began on June 27, 1995 with all parties present and represented by counsel and continued on June 28, 1995, September 6, and 7, 1995. The court conducted in-camera interviews with the children without a recording and in the presence of a staff worker as stipulated by the parties.
On September 27, 1995, the court issued a judgment entry sustaining CCDHS' motion for permanent custody and terminating the parental rights of Mitchell and Maloney. The court reviewed the history of the case and found that although both parents completed parent education classes, the class instructor expressed a concern as to whether either parent could apply what they learned. The court also noted the testimony of the counselor at SAVE who indicated that although both parents initially participated in counseling, Maloney failed to appear at further sessions and Mitchell's decision-making was not significantly improved and she needed further counseling.
The court found from the testimony that Mitchell had great difficulties obtaining a stable and suitable residence and had relocated her residence four times while the girls were in the temporary custody of CCDHS. The court noted that even Mitchell's attorney admitted that she had problems finding a stable residence. The court found her current residence substandard and inappropriate and also found that Mitchell continued to associate with the of sexual and perpetrator physical abuse of her children despite a case plan objective to the contrary. The court also found that she failed to provide financial support for her children and even asked them for part of their allowances while they were in foster care so that she could purchase food for herself.
With regard to Maloney, the court found that although the home in which he was residing was more habitable than Mitchell's, safety concerns still existed for young children. The court found extremely troublesome Maloney's "almost complete reliance" upon his ex-mother- and ex-sister-in-law and the fact that they were still residing together. The court found evidence that the ex-sister-in-law had her parental rights terminated in another state and evidence revealed that the ex mother-in-law helped the ex-sister-in-law to raise her children during that time. The court also found that Maloney had no plan for the rearing of his children, had provided no child support, and was completely reliant upon his ex-sister-in-law for transportation, because he had no driver's license due to the failure to pay a fine in another state.
The court also addressed Maloney's allegations that his deficiencies in not completing the case plan objectives stemmed from CCDHS failure to implement the case plan and to help him accomplish the objectives. The court quoted R.C. 2151.414(C) in effect at the time which provided that a court should not deny the agency's motion for permanent custody for the agency's failure to implement a particular aspect of the case plan. The court found that although brief periods of time may have elapsed where a specific caseworker was not assigned to the case, the parents knew their objectives and what they needed to do to be reunified with their children. The court found that it was in the best interests of all three children that permanent custody be granted to CCDHS.
On October 4, 1995, Maloney filed a notice of appeal. On October 30, 1995, Mitchell filed a notice of appeal. Between the time delay in obtaining a transcript of the lengthy merits hearing and the extraordinary number of leaves taken by all parties, especially the parents, to file appellate briefs, this Court herein finally reaches Appellants' assignments of error which have been separately briefed.
In her first assignment of error, Mitchell asserts:
 "THE TRIAL COURT ERRED IN SUSTAINING THE MOTION FOR PERMANENT CUSTODY, AS THE MOVANT FAILED TO MEET THE CONSTITUTIONAL (BOTH STATE AND FEDERAL) AND STATUTORY BURDEN OF CLEAR AND CONVINCING EVIDENCE.
 "A) THE TRIAL COURT ERRED IN FINDING SUFFICIENT EVIDENCE THAT APPELLANTS FAILED TO SUBSTANTIALLY REMEDY THE CONDITIONS CAUSING THE CHILDREN TO BE PLACED OUTSIDE THEIR HOME.
 "B) THE TRIAL COURT ERRED IN FINDING SUFFICIENT EVIDENCE THAT REASONABLE CASE PLANNING AND DILIGENT EFFORTS BY THE AGENCY TO ASSIST THE PARENTS TO REMEDY THE PROBLEMS THAT INITIALLY CAUSED THE CHILDREN TO BE PLACED OUTSIDE THEIR HOME HAD BEEN MADE."
Maloney's first assignment of error states:
 "THE TRIAL COURT ERRED IN GRANTING THE COLUMBIANA COUNTY DEPARTMENT OF HUMAN SERVICES' MOTION FOR PERMANENT CUSTODY IN FINDING THAT THE MOVANT, BY CLEAR, CONVINCING EVIDENCE, MET THE STANDARDS AND CRITERIA FOR PERMANENT CUSTODY PURSUANT TO RC SECTION 2151.414 AND 2151.414 (E)."
Mitchell and Maloney both contend that clear and convincing evidence was not presented to show that any of the eight factors listed in R.C. 2151.414 applied so as to find that the children could not or should not be placed with them.
In its comprehensive six page judgment entry, the trial court found that neither parent made significant progress in their case plans. Mitchell was still without an adequate home and still associating with the perpetrator of the sexual abuse of her children and Maloney was still residing with and inordinately relying on his ex-mother-in-law and ex-sister-in-law whose parental rights were terminated. The court also found that the children should not be placed with either parent and that both parents demonstrated a lack of commitment toward the children by showing an unwillingness to provide an adequate, permanent home for them. (9/27/95 J.E.). The court also found that the children were doing well in foster care and were adoptable.
The relevant portions of the 1995 version of R.C. 2151.414
provide:
 "(B) The court may grant permanent custody of a child to a movant if the court determines at the hearing * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 "(1) The child is not abandoned or orphaned and the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents;
"* * *"
 "(E) In determining * * *whether a child cannot be placed with either of his parents within a reasonable period of time or should not be placed with his parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * *that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents:
 "(1) Following the placement of the child outside his home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside his home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
"* * *"
 "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;"
"* * *"
 "(8) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect."
Generally, a reviewing court may not reverse a lower court judgment based upon the weight of the evidence because the lower court as trier of fact is in the best position to weigh the evidence and evaluate the testimony. In re Brown (1994), 98 Ohio App.3d 337,342. However, a trial court cannot grant permanent custody of a child to a human services agency on the basis of R.C. 2151.414(B)(1) unless the court finds by clear and convincing evidence that one or more of the conditions enumerated in R.C. 2151.414(E) exists. In re William S. (1996), 75 Ohio St.3d 95,99. This Court has held that a trial court's judgment on appeal from an order terminating parental rights will not be reversed if, upon a review of the record, we determine that the trial court had sufficient evidence to satisfy the clear and convincing evidence standard. In the Matter of Honeycutt (Mar. 6, 1998), Belmont App. No. 95-BA-48, citing In re Wise (1994),96 Ohio App.3d 619. Clear and convincing evidence involves more than a preponderance of the evidence and requires proof of each allegation clearly and convincingly so that a firm belief or conviction as to the facts is produced in the mind of the trier of fact. Honeycutt, supra; Brown, supra, quoting In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368.
Upon review of the record, we find that clear and convincing evidence existed to support the trial court's finding that the children could not be returned to their parents within a reasonable time or should not be returned to them at all under R.C. 2151.414(E)(1), (4) and (8). R.C. 2151.414(B)(1) and (4) apply to Mitchell's residential instability and homelessness. Clear and convincing evidence existed to show that she failed continuously and repeatedly for well over a period of six months to remedy the condition of homelessness and residential instability that resulted in the removal of the children from her care. Mitchell's own attorney admitted that she had trouble securing and maintaining a home. (Tr. p. 549). Caseworker Sherryn Swagger testified that Mitchell did not obtain adequate housing from July through August of 1993 and subsequent caseworker Carole Jean Freed testified that from August of 1993 through May of 1994, the two different residences that she did obtain were inappropriate for the children. (Tr. p. 155). Caseworker Christopher Gallo testified that from May 11, 1994 through January 30, 1995, Mitchell had moved four times. (Tr. pp. 213-215)
Mr. Gallo also made a home visit to Mitchell's latest residence at the time and testified that it did not have heat or adequate living space for the children. (Tr. pp. 217-218). The coordinator from the parenting classes also expressed concern over her instability in living arrangements, as she testified that Mitchell would tell her almost once a week that she was not staying at her trailer but was staying with different friends during the twelve week course. (Tr. pp. 314). The guardian ad litem expressed her main concern as Mitchell's unstable residence and provided pictures of the outside of her trailer home, noting that toilet facilities were located outside of the trailer and running water was located from a pipe in a wooded area outside of the trailer. (Tr. pp. 24-29). She also noted that a burned mattress, a freezer, a refrigerator and vehicle parts were scattered outside of the home and that refuse was piled around the home. (Tr. p. 27). Caseworker Sherryn Swagger confirmed the inadequate and dangerous conditions of Mitchell's trailer as she also visited the residence and took pictures. (Tr. p. 116)
Clear and convincing evidence under R.C. 2151.414(E)(1) and (8) was also presented of Mitchell's unwillingness to disassociate herself with persons causing risk to her children. She continued to associate with the perpetrator of sexual and physical abuse against her children. Caseworker Sherryn Swagger testified that physical and sexual abuse of the children was substantiated against Mitchell's live-in boyfriend in 1993. This was a condition which caused removal of the children. (Tr. pp. 107-110). The perpetrator admitted to Ms. Swagger that he abused the girls and wanted to demonstrate on her. (Tr. p. 125).
CCDHS filed a case plan on October 27, 1993 setting forth the objective that Mitchell not associate with persons causing a physical and sexual risk to her children. Caseworker Carole Jean Freed testified that from. August of 1993 through May of 1994, Mitchell continued to see the perpetrator and told the children not to tell CCDHS about her continued association with him because he would go to jail. (Tr. p. 156). Caseworker Carrie Mitchell testified that the girls' mother introduced the perpetrator to her as her boyfriend on August 3, 1994. (Tr. p. 492). Ms. Steffel testified that she saw Mitchell with the perpetrator as recently as January 13, 1995. (Tr. p. 98-99) This testimony established clear and convincing evidence that Mitchell was unwilling to protect her children and prevent them from physical and sexual abuse under R.C. 2151.414(E)(8).
The trial court also had clear and convincing evidence to find that Maloney's parental rights should be terminated because the children could not be returned to him within a reasonable time or should not be returned to him under R.C. 2151.414(E)(1) and (8). The guardian ad litem explained that Maloney's residence was adequate but noted that she found a large knife lying in the back yard, a hole in the ceiling of the house and an electrical wire hanging down from the ceiling of the stairs that could be harmful to the children. (Tr. pp. 41-42)
Maloney's main objective in his case plan was to obtain and maintain independent housing and to show that he could independently provide and care for his children. Specifically, Maloney was to obtain housing independent of his ex-mother- and ex-sister-in-law and provide a plan to independently care for his children. At the permanent custody hearing, the guardian ad litem told the court that Maloney's almost total dependence upon his ex-sister and ex-mother-in-law disturbed her and demonstrated that he was unwilling to make decisions regarding his own life and those of his children. (Tr. p. 15). The guardian found that Maloney did not maintain a household on his own and is dependent upon his ex-relatives for his survival. (Tr. p. 66}
Current caseworker Carrie Mitchell visited Maloney's place of residence with the guardian ad litem. She testified that the ex-mother-in-law was living there and the ex-sister-in-law told her that she did not live there full-time but Maloney gave her use of a bedroom, a bathroom and the living room. (Tr. p. 486-487). The ex-sister-in-law also told Carrie Mitchell that she and the ex-mother-in-law would be the caregivers for the children should Maloney be awarded custody. (Tr. p. 487). When the caseworker inquired into the ex-sister-in-law's background regarding her children, she found that the State of Michigan had permanently terminated her parental rights. (Tr. p. 488-489)
Carrie Mitchell also testified that Maloney explained to her that Michigan had the children because of allegations of sexual abuse against the ex-sister-in-law. (Tr. p. 489). The caseworker noted that the State of Missouri previously took custody of the ex-sister-in-law's children because she was living in her car. (Tr. p. 489)
Carrie Mitchell further testified that Maloney provided no plan as to how he would rear his children but provided a budget that his ex-mother-in-law had prepared for him. (Tr p. 485, 490). She also opined that the ex-mother-in-law was not a good support system for Maloney because she was living with the ex-sister-in-law in Michigan when the ex-sister-in-law's parental rights were terminated. (Tr. p. 491)
Caseworker Freed testified that during her involvement with Maloney from August of 1993 through May of 1994, he had not accomplished any of his case plan objectives. (Tr. pp. 159-161) She also commented on Maloney's dependence upon his ex-relatives. (Tr. p. 204). Caseworker Gallo also expressed his concern with Maloney's total dependence upon his ex-relatives and testified that he did not attempt to obtain independent housing and that his ex-relatives were always involved in every aspect of the case. (Tr. p. 219, 222). Mr. Gallo explained how Maloney's ex-relatives handled all of his finances, all of the housework and even his telephone calls with the caseworker to discuss the children and arrange visitation. (Tr. pp. 222-223)
Parenting class coordinator Kathy Esterline testified that her concern with Maloney was the extreme hostility that existed between the parents and Mitchell's mother and sister. (Tr. pp. 315, 332). Foster care provider for the children, Ruth Hixenbaugh, testified that Maloney did not interact much with the children during visits and noted that the ex-sister-in-law was always with him and drove him to the visits. (Tr. pp. 338, 388). She recalled instances when Maloney would have to spend a portion of his visitation time in the ex-sister-in-law's car with her because she waited in the car during the visitations. (Tr. p. 338). The foster care provider also recalled one of the children telling her that the ex-sister-in-law had previously touched them in inappropriate places. (Tr. p. 344)
Based upon this testimony, clear and convincing evidence was presented to show that for a period well beyond six months and up to the date of the permanent custody hearing, Maloney had failed to obtain independent housing and failed to demonstrate how he would care for his children. Further, the testimony regarding Maloney's total reliance upon his ex-sister-in-law and ex-mother-in-law to care for the children shows his unwillingness to protect his children from the risk of neglect or abuse that they alleged previously occurred with the ex-sister-in-saw. It also demonstrates Maloney's unwillingness to prevent a risk of harm to his own children.
Therefore, while the parents did complete some of their case plan objectives, such as parenting classes, psychological evaluations and some counseling sessions, clear and convincing evidence was presented that they failed to remedy the conditions causing the original removal of the children for a period extending beyond six months pursuant to R.C. 2151.414(E)(1). Mitchell failed to provide suitable or stable housing and failed to disassociate herself from a person who was a risk to her children physically and sexually. These are factors warranting a finding that the children cannot or should not be placed with her under P.C. 2151.414 (E)(1), (4) and (8). Maloney also failed to obtain independent housing and failed to demonstrate that he could care for the children independent from his ex-relatives which are factors additionally warranting a finding that the children cannot or should not be placed with him under R.C.2151.414(E)(4). A finding was also warranted under R.C.2151.414(E)(8) as Maloney also subjected the children to risk by associating with his ex-sister-in-law and living with his ex-mother-in-law who were both involved in raising children that the State of Michigan permanently removed from their care.
The trial court additionally considered the best interests of the children as required under R.C. 2151.414(B) and (D) which is not asserted as error. The court also considered the services that both parents had available to them as required under R.C. 2151.4141(E)(1) such as: parent education classes, counseling and visitation assistance, as well as the caseworkers' individual assistance to the parents. Appellants' first assignments of error are therefore without merit.
Mitchell and Maloney additionally assert in their first assignments of error that CCDHS did not undertake diligent efforts in helping them remedy the conditions causing removal of their children as required by R.C. 2151.414(E)(1). They complain that CCDHS did not provide them with adequate assistance in remedying the conditions causing removal of the children. Both parents note that there was a six month period of time from January 30, 1995 to June 15, 1995 when a specific caseworker was not assigned to the case.
R.C. 2151.414(E)(1) states that the agency must undertake "* * * reasonable case planning and diligent efforts * * * to assist the parents to remedy the problems that initially caused the child to be placed outside the home* * *." Testimony was presented that CCDHS provided an abundance of services to Appellants, including referring Mitchell to Adult Services to help her find a home (Tr. p. 108); placing the children in emergency day care so that Mitchell could have more time to find a home (Tr. p. 108); developing a case plan and meeting with Mitchell and Maloney to explain the goals (Tr. p. 179) and extending the accomplishment of these case plan objectives numerous times; referring Maloney to a resource center to help him find employment (Tr. p. 296); referring both parents to parent education classes, psychological evaluations and counseling (Tr. pp. 223, 230, 245-246); visiting the various homes of both parents (Tr. pp. 113, 161, 511); arranging for visitations and transportation for Maloney to the visits (Tr. p. 162, 163-164, 171, 223, 228, 275); investigating relative placements and making arrangements to meet the children's overall physical and emotional needs. (Tr. pp. 193, 215, 233, 245, 281, 285, 418, 508).
We hold that the court had more than sufficient evidence presented before it to find that the agency undertook reasonable case planning and diligent efforts for these parents although the court mistakenly stated that CCDHS made "reasonable efforts" rather than "diligent" efforts. While there was a period where there was no specific foster care worker assigned to the case, a supervisor from the agency was designated to handle the case until a specific worker was designated. (Tr. p. 524). Further, Maloney's counsel at the permanent custody trial admitted the diligent efforts and extent of the involvement of the CCDHS with both parents when he stated, "How has he not made progress as a result of your Department's involvement? I mean, you folks have helped these people get where they are right now." (Tr. p. 296)
Additionally, R.C. 2151.414(C) states that "[t]he court shall not deny an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan." In consideration of this provision and the testimony demonstrating the efforts undertaken by CCDHS and the guardian ad litem, a six month period where there was only a supervisor available to assist Mitchell and Maloney was not fatal to the motion for permanent custody.
In her second assignment of error, Mitchell states:
 "THE TRIAL COURT ERRED IN ADMITTING HEARSAY EVIDENCE PROFFERED BY APPELLEE AND SUCH WAS REVERSIBLE ERROR AS A VIOLATION OF APPELLANT'S RIGHTS UNDER THE U.S. AND OHIO CONSTITUTIONS."
In his second assignment of error, Maloney asserts:
 "THE TRIAL COURT ERRED IN OVERRULING WILLIAM MALONEY'S OBJECTION TO THE ADMISSION INTO EVIDENCE THE PREJUDICIAL FAXED HEARSAY SEVEN (7) PAGE DOCUMENT FROM THE STATE OF MICHIGAN REGARDING JEANETTE LETT."
Both parents assert that the trial court erred in admitting the facsimile report of a juvenile court order from the State of Michigan terminating the parental relationship between the ex-sister-in-law and her four children. Mitchell asserts that other hearsay admissions "were too numerous to list" but offers two other specific examples. We will only address these three evidentiary admissions as it is counsel's job to specifically set forth the errors for this Court's review.
Permanent custody hearings are adjudicatory in nature and therefore require compliance with the Rules of Evidence. In re Brofford (1992), 83 Ohio App.3d 869, 873. Evidentiary rulings are within the discretion of the trial court. In re S. (1995),102 Ohio App.3d 338, 343, citing State v. Long (1978), 53 Ohio St.2d 91,98. We will not disturb such rulings absent an abuse of discretion. Abuse of discretion "* * *connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, quoting State v. Adams (1980), 62 Ohio St.2d 151, 157. A court cannot admit hearsay in adjudicatory proceedings unless an exception is applicable. Brofford, 83 Ohio App.3d at 873.
The trial court did not err in admitting the facsimile of the juvenile court order from Michigan. Evid.R. 803 lists the following as an exception to the hearsay rule:
 "(8) Public records and Reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . ." [emphasis added].
The facsimiled court order received from that court falls within the 803(8) exception under both (a) and (b) because it is a record setting forth the activity of that office and is a matter upon which the law imposes a duty upon the juvenile court and that the court has a duty to report through a court order.
Even if the court erred in admitting the facsimiled juvenile court order terminating the sister-in-law's parental rights into evidence, evidence of the parental rights termination still existed. Maloney told caseworker Carrie Mitchell that he knew the ex-sister-in-law's parental rights were terminated due to sexual abuse. (Tr. P. 489). No objection was made to this statement. Accordingly, the failure to object waived any error in the admission of that evidence unless that error rises to "plain error." State v. Cardosi (1997), 122 Ohio App.3d 70, 73, citing State v. Wickline (1990), 50 Ohio St.3d 114. Even if counsel had properly objected, the evidence was admissible as an admission of a party opponent under Evid.R. 801(d)(2). See In re Coy (1993),67 Ohio St.3d 215, 217. Further, no plain error existed as the trial court could still have found clear and convincing evidence to warrant permanent custody on other grounds as Maloney failed to remedy the condition of obtaining independent housing for himself.
Mitchell contends that admission of the guardian ad litem report was also error because the report was partially based upon hearsay statements contained within investigative reports of CCDHS. The guardian ad litem's role is to investigate the ward's situation and then recommend to the court what he or she feels is in the child's best interest. In re Baby Girl Baxter (1985),17 Ohio St.3d 229. R.C. 2151.414(C) requires that a written report of the guardian "shall be submitted to the court" before or at the time of the hearing. The report is not to be submitted under oath. R.C. 2151.414(C).
We find that the trial court did not abuse its discretion in admitting the guardian ad litem's report based upon the statute requiring submission of the report and the guardian ad litem's testimony at the permanent custody trial. The guardian's report evidences at least thirteen personal contacts that she made with various persons connected with the case, including Maloney, the children, caseworkers, the ex-sister-in-law and ex-mother-in-law and the children's teachers. The guardian testified at the permanent custody hearing and was subject to full examination and cross-examination by all parties. (Tr. pp. 13-86). While the report may be based upon some instances of hearsay, we cannot find prejudice since the guardian testified as to these instances at trial and was subject to full cross-examination.
Mitchell also challenges the admissibility of alleged hearsay statements made by one of the caseworkers on the stand. The worker recounted what the children's foster parent told him regarding an unexpected appearance by Mitchell at a program when the children were temporarily placed with the foster parents. Mitchell references the permanent custody transcript at pages 301-303 in support of her assertion. However, we need not address this assertion as no objection appears on the record at this point in the transcript. The failure to object waived error in the admission of that evidence unless that error rose to the level of "plain error." State v. Cardosi (1997), 122 Ohio App.3d 70,73, citing State v. Wickline (1990), 50 Ohio St.3d 114. We further find no plain error as this testimony did not effect the outcome of the case. The second assignments of error of both parents are therefore without merit.
In her final assignment of error, Mitchell contends that:
 "THE TRIAL COURT ERRED IN OVERRULING APPELLANT Maloney'S MOTION FOR SUBSTITUTION OF AN ATTORNEY AT LAW AS GUARDIAN AD LITEM."
We will address this issue, although it was Maloney who filed the original motion for substitution of the guardian ad litem and he did not appeal this issue. Mitchell never joined the motion nor objected at trial to the guardian's continued testimony on the case. However, "[a]n appealing party may complain of an error committed against a nonappealing party when the error is prejudicial to the rights of the appellant." In re Smith (1991),77 Ohio App.3d 1, 13, citing State v. Ward (Sept. 21, 1988), Summit App. No. 13462, unreported. Further, it has been held that any error prejudicial to the children's interest in reunification is similarly prejudicial to the parents' interest. Smith, 77 Ohio App. 3
d at 13.
Mitchell's assignment of error is nevertheless without merit. The trial court has the discretion to determine whether to remove a guardian ad litem and we will not reverse its decision on appeal absent an abuse of that discretion. In the Matter of B.B.M. (Dec. 10, 1997), Ross App. No. 97CA2274, unreported. Therefore, without a finding that this discretion was unreasonable, arbitrary or capricious, this Court will not disturb the trial court's judgment. See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, quoting State v. Adams (1980),62 Ohio St.2d 151, 157.
R.C. 2151.281(B)(1) requires that the court appoint a guardian ad litem in a permanent custody proceeding. A guardian ad litem's role is to "investigate the ward's situation and then to ask the court to do what the guardian feels is in the child's best interest." In re Baby Girl Baxter (1985), 17 Ohio St.3d 229,232. R.C. 2151.281(J) provides that a court shall appoint a qualified volunteer as a guardian ad litem when appropriate. Neither statute nor case law requires the guardian ad litem to be an attorney or to have separate counsel. In re Bibb (1980),70 Ohio App.2d 117, 118-119. R.C. 2151.281(D) requires the court to discharge a guardian ad litem when the guardian ad litem fails "to faithfully discharge his duties." While R.C. 2151.281(H) recognizes that a child may need both a guardian ad litem and an attorney, the section states that the court can appoint an attorney to serve as counsel for the guardian ad litem. Nowhere in the statute does it mandate that an attorney be appointed as guardian ad litem in a permanent custody proceeding. Guardian ad litem volunteers undergo training for their positions and Mitchell asserts no specific instances where the guardian in this case failed to adequately protect the children's rights or otherwise failed to faithfully discharge her duties. This assignment is without merit.
Maloney's final assignment of error complains that:
 "THE JUVENILE TRIAL COURT ERRED IN FAILING TO FIND THAT LONG TERM FOSTER CARE WAS IN THE BEST INTEREST OF THE MALONEY FAMILY PURSUANT TO ORC SECTION 2151.415C(1)B."
In this assignment, Maloney reiterates his position that clear and convincing evidence did not exist to warrant the trial court to grant permanent custody to CCDHS. He again asserts that CCDHS did not undertake diligent efforts to assist him in accomplishing his case plan objectives. Maloney concludes that the trial court should have granted long term foster care instead of permanent custody because of these problems, the children's prior abuse at a foster home, and for the reason that the parents' significant psychological problems were on the way to being remedied. Maloney asserts that R.C. 2151.415(C)(1)(b) applies to warrant that the court should have granted long term foster care of the children.
We find this assignment of error moot since we have already held that clear and convincing evidence existed to warrant the court in granting permanent custody of the children in CCDHS. In re Egbert Children (1994), 99 Ohio App.3d 492, 496.
For the foregoing reasons, we find that the assignments of error advanced by Appellant are without merit. Accordingly, the trial court judgment is affirmed.
Donofrio, J., concurs.
Vukovich, J., concurs.
APPROVED:
 _________________________ CHERYL L. WAITE, JUDGE